UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PASHYA ARMSTRONG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:12-cv-987-WTL-TAB |
| ) | |
| CAROLYN COLVIN, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Pashya Armstrong requests judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying her Supplemental Insurance Benefits ("SSI") under Title XVI of the Social Security Act ("the Act"). The Court rules as follows.

## I. PROCEDURAL HISTORY

Armstrong was awarded SSI as a child and, after she attained age 18, her eligibility for those benefits was redetermined. On October 8, 2009, it was determined that Armstrong was no longer disabled as of October 7, 2009. This determination was upheld on reconsideration, and thereafter Armstrong requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A hearing, during which Armstrong was represented by counsel, was held by ALJ Ronald Jordan on January 11, 2011. A vocational expert testified at the hearing. ALJ Jordan issued

---

[1] Carolyn Colvin became Acting Commissioner of the Social Security Administration after this case was filed. She is therefore substituted as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

his decision denying Armstrong's continued eligibility for benefits on April 21, 2011. The Appeals Council affirmed the ALJ's decision on May 25, 2012, after which Armstrong filed this appeal.

## II. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so

long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and the Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning ... [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

### III. <u>MEDICAL EVIDENCE</u>

Plaintiff Pashya Armstrong, who was nineteen years old at the time of the administrative hearing, alleges disability due to ADHD, mild mental handicap, depression and anxiety. Armstrong lives with her child, her mother, two brothers, and a cousin; she has never lived independently. From October 2009 to June 2010, Armstrong lived with her stepmother, but she had to move out because she was having conflicts with her stepmother's oldest son and the son's fiancée. Armstrong's son was also having behavioral problems during that time, which would "stress her out," causing Armstrong to go into a room and shut the door to cool down. She reported sometimes just sitting on the couch and crying.

Armstrong has a ninth-grade education and, at the time of the hearing, was attending the Excel Center, an adult night school, at the twelfth-grade level. She reported reading at a fifth-grade level and writing at a sixth-grade level. While in school, Armstrong had special education programming.

Armstrong testified that she did not have any friends and did not associate with people outside of her family. However, she reported having Facebook and MySpace accounts, as well as a touch screen phone. She usually stayed at home and did not go shopping; rather, her sister shopped for her. She attributed this arrangement to not being "good" at shopping, as she bought the wrong sizes, forgot to keep receipts, and did not count her change. Armstrong does not have a driver's license.

Armstrong receives benefits on a debit card and keeps herself on a budget, as she has a young child. She testified that she spends her days watching television and caring for her son. Sometimes she does housework, such as laundry, for others. Armstrong testified that she has taken her son to a local swimming pool, but she did not swim herself because she had to watch her son carefully around the pool, given his young age.

The medical evidence of record indicates the following. Armstrong began treatment at the Midtown Community Mental Health Center in January 2008. At the intake evaluation, Armstrong was lethargic, but her mother reported that she was an excellent cook, felt bad about getting pregnant at age 14, and her problem was depression.

Armstrong did not attend two appointments at Midtown in January and March 2008, but she did attend two appointments in April 2008. She reported migraines and chest pains and sleeping most of the day and night. Armstrong explained that she did not want to go outside due to violence and she does not want to engage in social activities. Her mother noted that she had poor hygiene and had difficulty paying attention to her son.

Over the next five months Armstrong either canceled or did not show for any of her appointments, in part due to a typo resulting in her Medicaid being cancelled. Her next visit was in

September 2008; she reported ADHD and depression symptoms, but she was not taking her medication. She reported that she was not sleeping as much as she had in the past.

Her final visit to Midtown was in November 2008. She was pleasant and cooperative, but she reported loss of appetite, difficulty concentrating, and a disrupted sleep schedule. She also felt her Wellbutrin dosage needed adjusting.

Armstrong's mother called Midtown to end treatment in January 2009, explaining that Armstrong would get treatment from a school-based provider.

Armstrong visited the Pediatric & Adolescent Care Center in 2008 and 2009. In January 2009, Armstrong reported taking Wellbutrin, but in February 2009, she reported not taking her antidepressant because she was unable to fill the prescription, and she was prescribed Zoloft instead. In March 2009, Armstrong reported that she had not taken Zoloft the previous two days because it made her sleepy and upset her stomach, but nonetheless she reported feeling calmer.

In June 2009, Armstrong reported had "lost" the Zoloft in March, but wanted to restart the prescription. Her last visit was in August 2009. She reported that she had never started taking the Zoloft but that she felt much better anyway.

In a September 2009 consultative psychological evaluation, Dr. Herbert Henry, Ph.D., administered a mental status examination and the WAIS-III intelligence test. When initially asked why she could not work, Armstrong said she did not know. She then reported disability due to ADHD, but denied hyperactivity, saying she was very quiet. Clinical observation revealed normal behavior and Dr. Henry noted that Armstrong's adaptive life skills were also generally normal.

Dr. Henry determined that Armstrong put forth a good effort and the test results were therefore deemed valid. Dr. Henry assessed Armstrong with a full scale IQ of 70, which he noted was in the range of mild mental retardation, but he further opined that her "level of adjustment

exceeds the level of adjustment characteristic for mildly mentally retard individuals." He diagnosed her with borderline intellectual functioning and assigned her a GAF score of 70, indicating mild difficulties.

In an October 2009 psychiatric review, Dr. Donna Unversaw, Ph.D., diagnosed Armstrong with borderline intellectual functioning. Dr. Kenneth Neville, Ph.D., drew the same conclusion in December 2009.

In an October 2009 mental RFC assessment, Dr. Unversaw concluded that Armstrong was moderately limited in her ability to maintain concentration for extended periods, and understand, remember, and carry out detailed instructions. Otherwise, she found no other work-related limitations. Dr. Neville affirmed this opinion.

Armstrong received treatment at Gallahue Mental Health Services from January to July 2010. On a January 2010 intake phone call, Armstrong said she spent most of her time watching television in her room, and left her room only to cook, use the bathroom, and take care of her then–three-year-old son.

At a March 2010 assessment, Armstrong reported difficulty staying focused and extreme chest pain when she was upset. Armstrong reported a referral to counseling by the Social Security Administration, saying that she would lose her disability checks if she did not attend therapy. She reported fatigue, loss of energy, feelings of worthlessness, guilt, decreased concentration, indecisiveness, crying spells, irritability, restlessness, social withdrawal, and anger outbursts with screaming, yelling, and knocking over chairs. Armstrong reported homicidal ideation but denied having a plan. The counselor noted tangential thought processes and verbosity to the point of not being able to complete paperwork. The counselor found her mental judgment poor and her impulse

control fair. The counselor diagnosed depression and found moderate impairment in social functioning, but found no other work or daily activity limitations.

At a March 2010 medication follow-up, Armstrong reported low energy and periods of anxiety and distrust. At that time, Armstrong was not interested in starting ADHD medication. She was prescribed Zoloft.

In an April 8, 2010, therapy session, Armstrong discussed why she did not want to work. She said her mother was encouraging her to "act dumb" to get a disability check. The therapist told Armstrong that she was capable of independence and a career.

In an April 23, 2010 medication follow-up, Armstrong reported no benefit from Zoloft and wanted to try Celexa. Armstrong visited Gallahue again on April 29, 2010. She then failed to show for a June 2010 appointment and withdrew in July 2010. On discharge she was reportedly mildly improved, no longer in active treatment, and not on medication.

On November 23, 2010, the Excel Center, an adult night school, provided a guidance note in which her special education coordinator reported that Armstrong had some cognitive problems. The coordinator opined that if Armstrong were taught to use public transportation, she would attend school more regularly.

## IV. <u>THE ALJ'S DECISION</u>

Applying the five-step analysis, the ALJ found that Armstrong's disability ended on October 7, 2009, and she had not become disabled again since that date. At step one, the ALJ noted that the substantial gainful activity analysis was not used for determining disability at age 18. At step two, the ALJ determined that Armstrong suffered from the following severe impairments: attention deficit/hyperactivity disorder (ADHD), borderline intellectual functioning, and depression. At step three of the analysis, the ALJ determined that none of Armstrong's severe

impairments met or medically equaled a listed impairment.

At step four, the ALJ concluded that since October 7, 2009, Armstrong retained the residual functional capacity ("RFC") to perform medium work with the following additional limitations: work must be limited to simple, repetitive tasks, requiring minimal independent judgment or analysis, with static, predictable work goals from day to day; and the work must not include assembly line work, or any other work with unusual demands in time or production goals.

The ALJ concluded that, given Armstrong's RFC and considering her age, education, and work experience, Armstrong was capable of performing work that exists in significant numbers in the regional economy, including such representative occupations as cleaner, kitchen helper, dishwasher, and fast food worker. Therefore, the ALJ determined at step five that Armstrong was no longer disabled as defined by the Act.

## V. DISCUSSION

Armstrong advances several objections to the ALJ's decision, each is addressed below.

### A. Lack of Substantial Evidence to Support the ALJ's Decision

Armstrong argues that substantial evidence fails to support the ALJ's determination that Armstrong's impairments did not meet or medically equal listing 12.05C. According to Armstrong, the ALJ misapplied the regulation because he interpreted it to require a diagnosis of mild mental retardation instead of borderline intellectual functioning.

Listing 12.05, "Mental Retardation," provides that "mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," and "[t]he required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." Thus, a claimant's impairment must meet the diagnostic description in the introductory paragraph and any one of the

8

four sets of criteria. 20 C.F.R. pt 4040, Subpt P, App. 1 § 12.00A. Subsection C requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function."

Here, Armstrong argues that her IQ score of 70, combined with her depression, meets the requirements of this subsection of the listing. However, in his decision, the ALJ found the listing was not met on the basis of the introductory paragraph, "because, as discussed above, [Armstrong] has been assessed with borderline intellectual functioning as her level of adaptive function does not implicate mild mental retardation." In doing so, the ALJ did refer to Dr. Henry's report in which Armstrong was diagnosed with borderline intellectual functioning instead of mental retardation, but as the Commissioner points out, the ALJ's statement does not indicate that the ALJ "required" a diagnosis of mild mental retardation. Rather, the ALJ based his decision on the lack of deficits in adaptive functioning, as required by the listing, that were found by Dr. Henry at the time of his assessment and diagnosis. The ALJ thus determined that Armstrong failed to meet the listing for mental retardation.

In response, Armstrong contends that this conclusion is not supported by substantial evidence and points to evidence that Armstrong has never lived independently and isolates herself, sometimes spending as many as 22 hours of the day in her room. In addition, Armstrong highlights her history of special education programming.

"Deficits in adaptive functioning" denotes "inability to cope with the challenges of ordinary everyday life," for "[i]f you cannot cope with those challenges, you are not going to be able to hold down a full-time job." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). As an initial matter, Armstrong fails to articulate a relevant link between her decision to live with family and an inability to cope with daily life. However, even more importantly, in making his determination, the

ALJ supported his determination with substantial evidence. He noted that Armstrong was able to cook, clean, do laundry, and shop without assistance. He furthered noted that although she did not know how to drive, she denied having difficulty with directions in Indianapolis. He acknowledged that she spent most of her day watching television and reported anxiety around people, but noted that she presented as cooperative, friendly, and positively involved in her most recent formal assessment. Although the ALJ found moderate difficulties in maintaining concentration, persistence, or pace, he found that those limitations consisted of sustaining detailed or complex, as opposed to simple, work processes. In sum, the ALJ's independent review of the records, combined with his reliance on Dr. Henry's assessment, give substantial evidentiary support to his determination.

### B. Failure to Summon a Medical Expert (Psychologist)

Armstrong next argues that the ALJ erred when he did not call a medical expert to consider whether her combined psychiatric impairments met or medically equaled a listing. The Commissioner contends that there was no need to summon a medical expert because the ALJ was entitled to rely on medical opinions in the record.

Whether a claimant's condition equals a listed impairment is "strictly a medical determination" and "the focus must be on medical evidence." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). Nevertheless, an ALJ's decision to call a medical expert is discretionary, 20 C.F.R. § 416.927(f)(2)(iii), and an ALJ may rely on state agency physicians' opinions to determine disability. *Scott v. Sullivan,* 898 F.2d 519, 524 (7th Cir. 1990) (citing *Waite v. Bowen,* 819 F.2d 1356, 1360 (7th Cir. 1987)).

In addition to his own review of the record, the ALJ relied on the medical opinions of Drs. Henry, Unversaw, and Neville, in making his determination. Armstrong contends that the ALJ

could not have reasonably relied on those psychologists' opinions because they were conducted in 2009 and therefore omitted consideration of the 2010 treatment evidence. However, at the hearing, when counsel for Armstrong requested an additional psychological evaluation, the ALJ noted that there was already an evaluation in the record and asked if there had been any changes since that time. Counsel answered, "No." As counsel admitted that no changes have occurred since the 2009 evaluation, Armstrong has effectively conceded that the psychologists' assessments continue to reflect her condition, even though the reports do not incorporate 2010 treatment evidence. Accordingly, the ALJ did not err in relying on the 2009 evaluations and his decision is not subject to reversal on that basis.

### C. Credibility Determination

Armstrong next argues that the ALJ's credibility determination is erroneous because the ALJ "arbitrarily rejected" Armstrong's statements describing her disability. Specifically, Armstrong contends that the ALJ erred when he discredited her testimony in light of her sporadic treatment record.

An ALJ's assessment of the claimant's credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).[2] In assessing a claimant's credibility, an ALJ may consider the level or

---

[2] Armstrong further argues that the ALJ's decision is patently erroneous because it is perfunctory boilerplate and intentionally vague. While the ALJ recites a paragraph faulted by the Seventh Circuit as perfunctory, *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011), the ALJ's decision in *Martinez* included "no explanation of which of Martinez's statements are not entirely credible or how credible or noncredible any of them are." This is simply not the case with this ALJ's decision. In a detailed and thorough analysis following this "boilerplate" language, the ALJ reviews Armstrong's medical history and highlights discrepancies between Armstrong's testimony and the medical evidence that led to the ALJ's conclusion.

Finally, as is so often the case, the ALJ's credibility discussion begins with the finding that the claimant's statements concerning the intensity, persistence, and limiting effects of her

frequency of treatment. "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference. . . . An ALJ may need to 'question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.' . . . The claimant's 'good reasons' may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects." *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012) (citations omitted).

Armstrong argues that the ALJ erred because he did not "make any effort to determine why [Armstrong] had problems with compliance with her medications or supposed failure to seek treatment." It is true that the ALJ did not specifically inquire into explanations for Armstrong's sporadic treatment, but it was not necessary for him to do so because the medical record evidence and Armstrong's hearing testimony already provided it. For example, at the hearing, Armstrong offered that the reason why she was no longer on Zoloft was because she moved across town, away from her pharmacy, and when she called, no one answered the phone. However, inasmuch as the ALJ did not explicitly articulate his consideration of this evidence, he did run afoul of SSR 96-7p. Nevertheless, the Court finds that the error was harmless, because the ALJ otherwise engaged in a thorough analysis of the 96-7p factors. For example, the ALJ analyzed in detail the inconsistencies

---

symptoms are not credible to the extent they are inconsistent with the ALJ's RFC assessment. The Seventh Circuit has repeatedly noted that this boilerplate backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility. *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012) (quoting *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012) and citing *Parker v. Astrue,* 597 F.3d 920, 921-22 (7th Cir. 2010)). Credibility findings must have support in the record, and such hackneyed language seen universally in decisions adds nothing. *Shauger,* 675 F.3d at 694 (citing *Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir. 2011) and *Parker,* 597 F.3d at 921–22)).

in Armstrong's activities of daily living and her alleged impairments before concluding that "the claimant and her family have described daily activities that are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." Given the analysis the ALJ engaged in with respect to the SSR 96-7p factors, the Court finds that an explicit consideration of alternative explanations for Armstrong's sporadic treatment would not have changed the outcome.

### A.     Step 5 Determination

Finally, Armstrong contends that the ALJ's determination that she was not disabled because she could perform some jobs is in error. The source of this error, Armstrong argues, is the ALJ's RFC, which she asserts fails to account for her "deficiencies in social functioning." As examples, Armstrong points out that she does not have a driver's license or know how to use public transportation, and she spends as many as 22 hours a day alone in her room. In so arguing, Armstrong apparently faults the ALJ for not ultimately adopting an additional set of social limitations that he questioned the vocational expert about at the hearing. That is, at the end of the hearing, the ALJ added the following limitations to his hypothetical question of the vocational expert: "the individual should not be required to have contact with the general public to perform the functions of the job. And the individual should have occasional superficial contact with coworkers." However, ever if it were error for the ALJ to omit these additional limitations from his ultimate decision, it was harmless error. In response to the ALJ's question, the vocational expert testified that the same jobs were still available to Armstrong. The ALJ's decision is therefore not subject to reversal on this basis.

### VI. CONCLUSION

As set forth above, the ALJ built an accurate and logical bridge from the evidence to his decision and his decision is supported by substantial evidence. The decision of the Commissioner

is therefore **AFFIRMED**.

SO ORDERED:  07/22/2013

_William T Lawrence_ (signature)

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification.